IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **NATASHA MUHAMMAD,** | CASE NO.: |
| Plaintiff, | *Refiling of Case No.* 5:18-cv-02010 |
| vs. | JUDGE: HON JOHN R. ADAMS |
| **COUNTY OF SUMMIT,** | |
| and | |
| **SHERIFF STEVE BARRY,** *In his individual and official capacities*, | **COMPLAINT** Civil Rights (42 U.S.C. § 1983) |
| and | *(Jury Demand Endorsed Hereon)* |
| **DEPUTY CHRISTOPHER R. BOYD,** *In his individual and official capacities*, | |
| Defendants. | |

## I.     INTRODUCTION

1. This case, a refiling of Case No. 5:18-cv-02010, arises from the unjustified and unlawful use of force committed against a twenty-year-old pregnant woman by a Summit County Sheriff's Deputy.

2. That deputy has a known and troubled history of insubordination, dishonesty, and unlawful use of force.

3. On August 24, 2017, Defendant Deputy Christopher Boyd "tased" Natasha Muhammad because she did not immediately lie down on her stomach on a parking lot, upon his request.

4. He gave no warning that tasing would be imminent if she did not comply, and her actions posed no threat to the deputy or anyone else.

5. The County of Summit determined, in reviewing the incident, that "the level of force used by Deputy Boyd was within the parameters of the Use of Force Policy set by the Summit County Sheriff's Office."

6. On information and belief, this is because the County's Use of Force Policy is unconstitutional and fundamentally flawed.

7. Defendant Deputy Boyd had previously been fired by the Summit County Sheriff's Office for unlawful use of force, insubordination, and dishonesty during the course of an investigation into his unlawful use of force. But the County hired him back following the Defendant's filing of a grievance.

8. Ms. Muhammad brings this action for violation of her rights under the United States and Ohio Constitutions and for negligent infliction of emotional distress.

## II. JURISDICTION AND PARTIES

9. Plaintiff Natasha Muhammad is, and at all times relevant to the events described in this Complaint was, a resident of Stark County, Ohio. She is a member of the United States Army National Guard.

10. Defendant County of Summit is a political subdivision located in Summit County, Ohio. It is a "person" under the meaning of 42 U.S.C. 1983. Upon information and belief, the County is responsible for establishing policies, procedures, and training materials for the Summit County Sheriff's Office (SCSO).

11. Defendant Sheriff Steve Barry is, and at all times relevant to the events described in this Complaint was, a resident of Summit County, Ohio. At all such times he is

and was employed by the Summit County Sheriff's Office (SCSO). He is a "person" under the meaning of 42 U.S.C. 1983 and is sued in both his individual and official capacities.

12. Defendant Christopher R. Boyd is, and at all times relevant to the events described in this Complaint was, a resident of Summit County, Ohio. At all such times he is and was employed by SCSO. He is a "person" under the meaning of 42 U.S.C. 1983 and is sued in both his individual and official capacities.

13. This Court has jurisdiction over Plaintiff's claims for violations of her federal constitutional rights, pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1343(a)(3) (jurisdiction over federal constitutional claims). This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367(a), because these claims arise out of the same set of facts as the federal claims such that all claims form part of the same case or controversy.

14. Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to the claim occurred in this district.

### III. FACTUAL BACKGROUND
#### A. Deputy Boyd's Background

15. Defendant Deputy Boyd has a troubled history as a Sheriff's Deputy, including being fired for significant, dangerous misconduct and dishonesty—and then being re-hired by the same office.

16. That history includes the following:

    A. Defendant Deputy Boyd received a Written Warning for an incident occurring on February 14, 2015, in which he took photographs of another deputy and civilians and posted them on Facebook, in violation of two Sheriff's Office rules;

3

    B.    Defendant Deputy Boyd was reprimanded for "rude and insensitive remarks" during the evaluation period from June 21, 2006, to June 21, 2007;

    C.    Defendant Deputy Boyd was advised in another evaluation that he had had "numerous problems * * * in dealing with inmates and staff [of the Summit County Jail]" and must "learn to keep his emotions in check"; and

    D.    He was previously fired from the SCSO for use of force, insubordination, and dishonesty, in connection with a disturbing April 2008 incident discussed in more detail below.

17.    On April 6, 2008, Deputy Boyd pursued a motor vehicle in a high-speed chase despite being specifically warned not to engage in any such pursuit because he had a civilian in his own vehicle with him.

    A.    Upon the completion of the pursuit, he then fired multiple shots at the vehicle.

    B.    SCSO determined he lied during the course of the investigation about the circumstances under which he fired his gun, including whether the vehicle posted a threat to him at the time he fired.

    C.    SCSO fired him for insubordination, violating polices of the SCSO, and dishonesty.

    D.    Defendant Boyd filed a grievance against the County and was ultimately given his job back.

    E.    There is no mention in Defendant Deputy Boyd's personnel records of any remedial steps taken to address his misconduct, inappropriate use of force, or dishonesty.

    F.    Having been required to take Defendant Deputy Boyd back, SCSO apparently decided that he no longer posed any danger to civilians and no extra training or remediation was required.

G. This was not the case.

### B. The County Policy on Use of Force

18. The official County/SCSO use-of-force policy that was in effect on August 24, 2017 (the "Policy") consists of just seven pages.

19. Upon information and belief, Defendant Sheriff Barry adopted the Policy, and was authorized to do so under law.

20. The words "taser," "controlled energy devices," or "electronic control weapons" are mentioned nowhere in the Policy.

21. There are no reasonable limitations, or any instruction at all on the use of tasers.

22. The Policy does, however, provide that deputies may use "impromptu implements or objects" such as a "flashlight, stone, or chair" under certain circumstances.

23. The Policy advises deputies to "respond in an objectively reasonable manner to a subject's actions or perceived actions of resistance or aggression" including "to stop potentially dangerous or unlawful behavior."

24. The Policy advises deputies that they "may only use force in the performance of their duties that is reasonably necessary to affect [*sic*] lawful objectives including:

    1. "Affecting [*sic*] a lawful arrest;
    2. "Overcoming resistance to lawful authority or control;
    \* \* \*
    6. "Escapes or other crimes."

25. The Policy fails to incorporate appropriate and widely recognized policy recommendations that verbal warning be provided to a suspect before a taser is deployed, or that tasers should only be used where the subject is "actively or aggressively resisting."[1]

---

[1] *See* Consent Decree in *United States of America v. City of Cleveland*, N.D. Ohio No. 15-CV-01046 (*available at* https://www.justice.gov/sites/default/files/crt/legacy/2015/

5

26. No warning was given to Ms. Muhammad, and she was not actively or aggressively resisting.

27. The Policy fails to provide any limitations about using force against pregnant women.

28. At the time of the tasing, Ms. Muhammad was nine weeks pregnant.

29. Without meaningful limitations, and with such broad categories of appropriate uses of force—such as to "stop potentially dangerous and unlawful behavior," to "overcom[e] resistance to lawful authority or control," or circumstances involving "escapes or other crimes"—the Policy appears to give deputies broad authority to use force in virtually any circumstance they deem fit.

30. In fact, any circumstance in which an individual declines to immediately follow a deputy's instruction, no matter how unreasonable the instruction, could apparently justify the use of force under the Policy.

31. This Policy is plainly unconstitutional, as it gives deputies virtually unfettered freedom to use force against civilians.

32. This Policy led directly to the injury and damages suffered by Ms. Muhammad.

### C. The August 24, 2017 Incident

33. Natasha Muhammad is a new mother. At the time of the events that occurred, she was pregnant.

34. Ms. Muhammad is a small woman, approximately 5'4" tall and weighs under 120 pounds.

---

05/27/cleveland_agreement_5-26-15.pdf); U.S. Department of Justice Office of Community Oriented Policing Services and the Police Executive Research forum, *2011 Electronic Control Weapon Guidelines* (*available at* http://www.policeforum.org/assets/docs/Free_Online_Documents/Use_of_Force/electronic%20control%20weapon%20guidelines%202011.pdf).

35. On August 24, 2017, Ms. Muhammad received a call that her car had been vandalized while in the parking lot at InfoCision.

36. Ms. Muhammad traveled to the scene. The vandal was still present.

37. Ms. Muhammad yelled at the vandal.

38. Summit County Sheriff's Deputies were summoned to the scene.

39. Defendant Deputy Boyd was the first to arrive.

40. On information and belief, Defendant Deputy Boyd is around 5'11" tall and weighs over 200 lbs.

41. Defendant Deputy Boyd approached Ms. Muhammad.

42. Ms. Muhammad did not run or attempt to escape.

43. Defendant Deputy Boyd told her to lie on the ground.

44. Ms. Muhammad said "no."

45. Defendant Deputy Boyd immediately discharged his taser for a five-second interval, with probes impacting Ms. Muhammad in her forearm and her abdomen.

46. He gave no warning that tasing was imminent.

47. As Defendant Deputy Boyd discharged his weapon, her boyfriend yelled out to the deputy that she was pregnant, to which the deputy responded, "It doesn't matter."

48. Victims of tasing experience "excruciating pain," and tasing "involve[s] a significant degree of force." *Cockrell v. City of Cincinnati*, 468 Fed.Appx. 491, 492, 497-498 (6th Cir. 2012).

49. Ms. Muhammad experienced excruciating pain and sustained physical injuries and emotional injuries. The latter continue to this day.

50. Charges were brought against Ms. Muhammad for obstructing official business and disorderly conduct. She pleaded no contest to disorderly conduct, and the charge of obstructing official business was dismissed.

51. While Ms. Muhammad was crying, in pain with probes still in her skin, and panicked about the effect of the taser probes on her developing baby, another SCSO deputy interrogated her about the use of force.

52. In the use-of-force report later completed by SCSO, Defendant Deputy Boyd claimed that Ms. Muhammad "began to walk backwards" and "began glancing around using only her eyes" prior to the deployment of his weapon.

53. Defendant Deputy Boyd stated that, "[f]rom prior training and experience, I took this as a sign she was looking for a path to escape."

54. He never alleged that she had a weapon, posed a threat to anyone, or was acting aggressively.

55. He never alleged that she was even attempting to escape.

56. Ms. Muhammad had no weapon and took no actions that could have been taken as a threat.

57. Ms. Muhammad was approximately 300 yards away from the individual Defendant Deputy Boyd believed she was going to "fight."

58. In its review of the incident, SCSO determined that "the level of force used by Deputy Boyd was within the parameters of the Use of Force Policy set by the Summit County Sheriff's Office."

59. This was the natural and expected outcome, as the Policy permits virtually any use of force.

60. Defendant Deputy Boyd's actions could only be found "within parameters" of an unconstitutional and deeply flawed Policy.

### IV. FIRST CAUSE OF ACTION
**Violation of the Fourth Amendment to the United States Constitution**
(*Against All Defendants*)

61. Ms. Muhammad re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

62. Defendant Deputy Boyd misused his authority under color of law and used his taser against Ms. Muhammad without justification. He violated her right to be free from unreasonable seizure under the Fourth Amendment to the United States Constitution.

63. This use of force was unreasonable and violated Ms. Muhammad's rights because she never threatened or attempted to harm him or the other deputies; did not pose an immediate threat to any other individual; and was not actively or aggressively resisting.

64. Defendants County of Summit and Sheriff Barry failed to properly train or supervise Defendant Deputy Boyd in the use of force and use of tasers.

65. Defendants County of Summit and Sheriff Barry improperly hired Defendant Deputy Boyd.

66. On information and belief, Defendants County of Summit and Sheriff Barry ratified a custom and practice of unauthorized use of force, thereby giving it the weight of official policy.

67. The County further adopted a Policy that gives deputies much broader authority to use force than is actually permitted under the law.

68. These actors acted with deliberate indifference.

69. These acts and omissions actually and proximately caused damage to Ms. Muhammad.

70. The Defendants are liable, and Ms. Muhammad is entitled to recover, under 42 U.S.C. § 1983.

### V. SECOND CAUSE OF ACTION
### Violation of Article I, Section 14 of the Ohio Constitution
*(Against All Defendants)*

74. Ms. Muhammad re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

75. The same facts underlying the First Cause of Action represent a violation of Ms. Muhammad's rights under Article I, Section 14 of the Ohio Constitution.
76. These acts and omissions actually and proximately caused damage to Ms. Muhammad.

## VI. THIRD CAUSE OF ACTION
### Negligent Infliction of Emotional Distress
*(Against Defendant Deputy Boyd)*

77. Ms. Muhammad re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.
78. Defendant Deputy Boyd engaged in conduct so extreme and outrageous as to extend beyond the bounds of decency. This conduct is intolerable in a civilized society.
79. He should have known that his conduct would cause serious emotional distress to Ms. Muhammad.
80. His conduct did actually and proximately cause serious emotional distress to Ms. Muhammad.

## VII. JURY DEMAND

81. Ms. Muhammad demands a trial by jury on all issues so triable.

## VIII. PRAYER FOR RELIEF

**WHEREFORE**, Ms. Muhammad respectfully asks this Court for the following:

    A. Compensatory, consequential, and punitive damages in an amount in excess of $200,000;
    B. Reasonable attorney fees, as allowed by law;
    C. Costs associated with this action; and

D.     Such other further relief as this Court deems just and proper, and any other relief as allowed by law.

    Respectfully submitted,

/s/ Rebecca J. Sremack
Rebecca J. Sremack #0092313
William M. Sremack #0006832
Sremack Law Firm LLC
2745 South Arlington Road
Akron, Ohio 44312
Office: 330.644.0061
Fax: 330.644.0061
info@sremacklaw.com

/s/ Billi Copeland King
Billi Copeland King (0083422)
Billi Copeland King, Law Office
282 Ashford Dr,
Copley, OH 44321
Telephone: (330) 990-4911
info@billicopeland.com

*Attorneys for Natasha Muhammad*

11